FANNIE L. RANDOL, Appellant, v. KLINE'S INCORPORATED, WALTER J. PACKWOOD and CHARLES R. LAMPING.—18 S. W. (2d) 500.

Division Two, April 5, 1929.

*Harry G. Kyle* and *Walter A. Raymond* for appellant.

*Salkey & Jones* and *Russell Field* for respondent.

DAVIS, C.—This is an action to recover damages for malicious prosecution, the petition praying $50,000 actual and $50,000 punitive damages. At the close of plaintiff's evidence, the court gave a peremptory instruction to find for defendant, and plaintiff suffered and took an involuntary nonsuit with leave to set the same aside. Within four days, plaintiff filed her motion to set aside the nonsuit so taken, which the court overruled, and plaintiff appealed from the judgment entered on the ruling.

The facts submitted warrant the finding that plaintiff, thirty-eight years of age, was born in Newton County, and reared there, and attended the High School at Neosho and the State Normal Institute at

Joplin. Thereafter she taught school for six years. She then married, and with her husband moved to Kansas City about thirteen years previous to her arrest and prosecution. Subsequently she worked as a saleswoman in five or six stores, among which was that of defendant corporation and the Jones Store, at which latter place she was in charge of the fur department. Later, as a partner, she was engaged, with her husband and a Mr. Love, in the operation of a retail ice business in Kansas City, and was so engaged at the time of her arrest and prosecution. The business was conducted from her home, and plaintiff kept the books, attended the telephone, collected and banked money and purchased equipment. For seven or eight years she had taught a Sunday School class in the Hyde Park Christian Church. The record is without a scintilla of evidence denying her prior good reputation, but on the contrary it is shown to be good.

The defendant corporation, at the time of plaintiff's arrest, was operating a department store in Kansas City, consisting of five floors, which extended from Walnut to Main Street. Defendant Packwood was the manager thereof, and defendant Lamping the office manager. On June 16, 1923, plaintiff was arrested and listed for prosecution in the Kansas City police court. She left home that morning, about eight-thirty A. M., with the intention of exchanging a brassiere, which she had previously purchased from defendant corporation, as well as to shop and to collect an account. She intended to visit at ten A. M. the office of an attorney, who was in charge of a composition for a client indebted to plaintiff. On her way to town plaintiff noted on an envelope certain items of intended purchases, which were "colored shoes, bias binding, tea strainer, hose, gloves, thread and Taylor's lunch cloths." It was raining as well as cool, and plaintiff wore a cape and carried an umbrella. The house detective, who later arrested plaintiff, wore a jacket. Plaintiff arrived at the entrance to the store about five minutes before nine, before the store opened for business. There was a lobby in front of the entrance to the store, twenty-five or thirty feet deep, extending from the sidewalk to the door. In the center of the lobby was an enclosed show case, with aisles on each side, all of which, including the lobby, were a part of the store. As the store was closed, plaintiff "window shopped" and followed and viewed display windows for a block. However, she noticed in defendant's window a pair of blue shoes displayed in the show case in the lobby about a foot from the door to the store proper; she also became interested in beaded bags she observed on special sale. On returning from "window shopping," she entered, as the first customer of the day, defendant's store, and, upon inquiring for beaded bags, she was directed to a table twenty or twenty-five feet west of the door, where the bags were heaped. However, the sales-

woman, who was dusting and arranging merchandise, made no effort to wait on her. Plaintiff then requested the girl to wait on her, and, on coming forward, plaintiff asked to look at black bags. Upon telling her that there were no black bags in the lot, the girl showed her bags of various colors, among them yellow, green and dark blue. Finally she was shown a steel bag, which she purchased for $3.49, and was handed the bag wrapped up and $1.51 in change, in return for a five-dollar bill tendered. The girl returned to her duties and resumed dusting. While waiting for the bag and the change, a woman, who plaintiff thought was a customer but who later developed to be a house detective, approached the table and handled the bags. In doing so, she turned over a light blue bag and remarked that she had bought a similar bag at the Parisian a few days before for $7.50. Plaintiff waited until she laid the bag down and then picked it up and examined it. Thinking that the light blue bag was more attractive than the steel, and wondering whether it matched the shoes in the window, she first took the bag a few feet to a mirror, holding it against her dress, and, with an umbrella, hand bag, brassiere, steel bag and the blue bag in her arms, she proceeded to the door, with the intention, if the blue bag matched the shoes, to ask the salesgirl to exchange the steel bag for it. As she got even with the door, she glanced at the salesgirl, but, as she had her back to plaintiff, plaintiff stepped to the door and while in the door, she compared the bag with the shoes, and, to get better light, she draped the bag over her knee and held it against the glass show case. Plaintiff stated that a custom obtained permitting customers to take goods to the daylight to look at the color; and that it was the custom to conduct negotiations with the salesgirl waiting on one.

At this juncture the detective, a woman, took plaintiff by the shoulders and turned her around. She grabbed the blue bag and said, "What are you doing with that bag? Are you stealing that bag or are you going to buy the bag?" Plaintiff said, "No, I have just purchased one," and the woman said, "Well, you were stealing it." Plaintiff said, "No, I was not stealing the bag." The woman said, "Well, all right, we will go upstairs and explain this to the superintendent." The detective took plaintiff by the arm and propelled her to the elevator. She conducted her to the office and closed the door. Plaintiff said that, when the detective apprehended her, she knew that she was a commissioned officer and a house detective, but that she had never known her before. In the office Lamping was sitting at a desk. The detective said, "Mr. Lamping, I caught this woman stealing one of our bags." Plaintiff said, "I beg pardon, I was not stealing your bag. I had no intention of stealing your bag." Lamping filled out a prepared paper and said to plaintiff, "Sign

that," but the name written therein was not that of plaintiff. She refused to sign it, saying, "Why, I can't sign that because that is not my name." She then said, "I am Mrs. Randol." Lamping crumpled the prepared statement and wrote another. He said, "Now, sign this." Plaintiff said, "I am not going to sign it. I am not guilty. I did not take that bag. I had no intention of stealing your bag." She then said, "What do you want me to do? You want me to buy this bag?" She then explained to Lamping that she had bought a bag and had in mind exchanging it for the blue bag.

At this juncture Packwood was called into the office. Plaintiff asked them to send for certain people in the employ of defendant, whom plaintiff knew, but they refused to do so. The evidence shows that plaintiff had about $200 in cash in her bag. She asked Packwood if it was probable that a woman who had money in her purse would stoop to steal a $3.49 bag, and Packwood replied, "I am sure your friends will be very proud to see you in this place at this time." Packwood and Lamping left. The detective turned to plaintiff and said, "Now why don't you come across and just admit that you stole this bag?" Plaintiff said, "I did not steal it, had no intention of stealing it." The detective said, "A pretty clever shoplifter you are." She said that was her business, and had caught many shoplifters, who at first denied and then signed the paper. She again insisted that plaintiff sign it, and plaintiff refused. Packwood and Lamping returned, demanding plaintiff sign the paper and plaintiff repeatedly refused, saying, "I don't have to steal a bag; I can buy one." Lamping said, "Well, we have no more time to fool with her. This is Saturday and a busy morning. Just call a police officer and send her down," at which plaintiff remonstrated and asked them not to do it. She said her husband had just started in business, and that they were building up, and that she did not feel that they could afford to have anything made public. Lamping then informed her that he was sure her customers would be glad to hear it; that he thought she was guilty; that she was a very clever shoplifter, and that there was every reason why she should be sent to the police court.

At this time a second house detective came in, and she said, "Well, I am surprised. I would have almost as soon thought of seeing one of my sisters here as seeing you." At a glance from Lamping she left. They again asked her to sign the paper, and she refused. Plaintiff told them that she must be at her lawyer's office at ten o'clock, and it was then ten-thirty, and she said, "I have business to attend to, and I think you have no right to hold me here." Lamping said, "I have every right to hold you that we want. We can hold a shoplifter until an officer comes." The detective then said,

"If I were you, I would sign that. You know you are guilty. If you sign this confession, it will never be known outside of this room unless you are caught again stealing in this store. Aren't you going to be big enough to sign this?" Plaintiff said, "I am not going to sign it." She again remonstrated with Packwood and Lamping, because her husband was just starting in business. Lamping said, "Well, sign that," and plaintiff said, "No, I am not going to sign it." Lamping again picked up the telephone to call the police, but did not do so. Plaintiff said they talked for a few minutes and she refused to sign it upon being asked, but as she sat there and thought a few minutes, she thought she'd sign it and get out, so she asked Lamping for his fountain pen and he handed it to her. She did not read the paper, but she understood its purport, as she herself had taken shoplifters to the office. Lamping, however, just told her to sign it, and she said, "I will sign this, Mr. Lamping, not because I am guilty, but because I am going to get out of this office." He said, "You can't sign it under those conditions," but plaintiff said she signed her name at that time, and that the moment she signed it, Lamping turned around, picked up the telephone, called for the police station, and said, "We have a shoplifter up here in the office; send an officer up after her." Before that, however, the detective said to plaintiff, "You had just as well sign that, because if they send you down to police court, Judge Kilroy is a friend of mine and I have never taken a shoplifter down there who has not been convicted." It was ten minutes before the officer arrived, and plaintiff had been kept in the office for about two hours. When Officer Green arrived, Packwood said, "Officer, take this woman down to the station. We got no more time to fool with her. Take her to the station." The officer did so. The detective said that plaintiff admitted her guilt. She also said plaintiff said that she would sign the confession, but that it was not the truth. While in the office, plaintiff told them that she was matching the bag with a pair of shoes. She told them that she had theretofore worked in the store. Plaintiff asked them to call the woman in the store who knew her, and make inquiry as to her reputation and standing but they refused to do so. She asked them particularly to call Miss Hatch and Miss Raffel, who had lived in plaintiff's home. Defendants did not make inquiry of the salesgirl who sold the steel bag to plaintiff. She was told that, if she would sign the statement, nothing more would be heard of the incident, and that they would let her go. Plaintiff stated that while she was in the office Packwood and Lamping and the detective kept calling her a liar, a thief and a shoplifter for an hour and a half to two hours; that she became very nervous and to everything that she would say to them in explanation, they would tell her that she was a clever thief and a clever shoplifter.

The chief of detectives examined plaintiff then she was taken to the station. He said to Lamping, " 'Now that I have talked to this woman quite a little while, will you prosecute her?' He said 'Yes,' and in substance I told him I believed what she had told me to be the truth. 'Well,' he said, 'we will prosecute her.' " Plaintiff's bond was fixed at twenty-five dollars cash, which she gave, and she was released to later appear for trial.

The charge filed in the police court charged plaintiff with living idly and being a frequenter of saloons, barrooms and bawdy houses and being a frequenter of bar houses for purposes of prostitution and of soliciting patronage in streets and public places. She was further charged with being a prostitute and a lewd woman and being a female having a reputation of being a prostitute and conducting herself in a boisterous and indecent manner. She was further charged with taking and carrying away articles of personal property, being the property of another and not being able to give a good reason for so doing. She was further charged with being a vagrant.

On trial in the police court, plaintiff was convicted and fined ten dollars upon the testimony of Lamping, the house detective and the salesgirl. Lamping testified in the police court that plaintiff willingly signed the paper, and that she said she was guilty. Plaintiff testified that, when she said that she would sign it because she wanted to get away but not because she was guilty, Lamping said, "We will protect ourselves against any damage suit that you might want to bring afterward."

After her release that same evening, plaintiff and her husband visited the office of defendants. Packwood reiterated that plaintiff was a shoplifter and a thief. Mr. Randol thereupon slapped Packwood over and knocked Lamping through the door, and repelled an attack from another employee. Upon a trial before a jury in the circuit court, upon appeal from the police court, plaintiff was found not guilty and discharged. The confession signed by plaintiff admitted and confessed that she stole, with the intention to obtain and keep the same without paying therefor, one purse, and that it was of her own free will and accord, without threats, coercion or promise of leniency.

Plaintiff testified that the house detective testified in the police court that plaintiff was out on the sidewalk with the bag. The detective testified on appeal that plaintiff said she would sign the confession, but it was not the truth, and Lamping said "No," she could not sign it under those conditions. The detective further testified on appeal that plaintiff admitted that she took the bag and was outside the store with it, and that she admitted it before she signed the confession. Other salient facts will be stated in the opinion.

I. Plaintiff, in being forced by the action of the trial court to take an involuntary nonsuit, was denied the right to submit her cause to the determination of the jury. The court adjudged, in substance, that the facts submitted and the inferences therefrom lacked sufficient probative force to warrant submission, thus deciding that plaintiff, as a matter of law, could not recover. The action of the trial court is assailed. In considering the propriety of its ruling, the facts adduced in evidence, together with all reasonable inferences therefrom, must be taken as true. [State ex rel. v. Trimble, 300 S. W. 475; Wilson v. Buchanan County, 298 S. W. 842.]

II. With the preceding concept in mind, we proceed to a discussion of issues and probative facts. 38 Corpus Juris, page 386, states the elements of an action for malicious prosecution thus: "(1) The commencement or continuance of an original criminal or civil judicial proceeding. (2) Its legal causation by the present defendant against plaintiff who was defendant in the original proceeding. (3) Its bona-fide termination in favor of the present plaintiff. (4) The absence of probable cause for such proceeding. (5) The presence of malice therein. (6) Damage conforming to legal standards resulting to plaintiff." We find it unnecessary, regarding the first and sixth elements, to say more than it is evident that a criminal proceeding was commenced against the present plaintiff in a police court having jurisdiction, and that the matter of damage to plaintiff was a jury question.

III. The second element may be summarily disposed of. Plaintiff testified that the assistant manager of defendant corporation, Lamping, called the police and directed her arrest and prosecution for shoplifting. The chief of detectives deponed that Lamping said, in face of the chief of detectives's statement to him, that he believed, upon talking to plaintiff, what she had told him to be the truth, "Well, we will prosecute her." Legal causation, under the evidence, the verity of which was for the jury, connects the defendants with the original proceeding in the police court as the instigators thereof, and as the proximate and efficient cause of putting the law in motion.

IV. As to the third element, the record develops that plaintiff was convicted on trial before the police judge, but that she appealed to the circuit court and was there acquitted by a jury. Naturally, the

inquiry arises as to the effect of the conviction of plaintiff in the police court. From a conviction in the police court an appeal lies, and the cause is triable *de novo* in an appellate court before a judge and a jury. The judgment of conviction in the police court, if not attacked, is generally conclusive, but, where an appeal is taken, the trial *de novo* in the appellate court and an acquittal so acts upon the judgment of the police court that the acquittal of the accused renders the police court judgment merely a circumstance to be considered by the jury. The conclusion is based upon the hypothesis that a police court judgment cannot be conclusive unless it is a final judgment, and a judgment of conviction in the police court, nullified by a judgment of acquittal in the appellate court, is not a judgment forestalling the establishment of want of probable cause. In an able discussion by WALKER, J., in Hanser v. Bieber, 271 Mo. 326, 197 S. W. 68, as to the effect of a conviction in the police court and an acquittal on appeal, this court held that the defense interposition of the judgment of former conviction is not conclusive showing of probable cause, but that the former conviction in the police court is admissible as prima-facie evidence of probable cause, subject to rebuttal by proof of the reversal of the judgment of conviction in the appellate court, after a full and fair hearing of all the facts and any other relevant evidence, thus making the question of probable cause, as it should be where disputed, one of fact for the jury upon all the evidence in the case.

V. The fourth element of an action for malicious prosecution involves probable cause for the prosecution. It is well settled that the want of probable cause is an indispensable element of an action for malicious prosecution. It may be defined as consisting of reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man believing that accused is guilty of the offense charged. [38 C. J. 398, 403; Hanser v. Bieber, 271 Mo. 326, 197 S. W. 68.] It may be denominated a mixed question of law and fact. Whether the facts and inferences show probable cause is a question of fact for the jury. Whether the facts, if true, develop probable cause is a question of law determinable by the court (Hanser v. Bieber, supra). Wilcox v. Gilmore, 320 Mo. 980, 8 S. W. (2d) 961, 1. c. 963, is authority for the statement that a judgment of conviction stands as undisputed evidence of the existence of probable cause, unless it be further shown that the judgment was the result of fraud, corruption, false testimony, or other improper means, or that those responsible for the prosecution did not believe the acts and circumstances al-

leged and brought forward to induce the judgment. However, the Wilcox case did not involve a police court conviction. Even in those jurisdictions where a judgment of conviction is held to be conclusive evidence of probable cause, yet, if it be shown that it was procured by the prosecutor through fraud or by means of known false testimony, the plaintiff may recover damages. [18 R. C. L. 38, notes 1 and 2.] And in this connection it may be said that, while the plaintiff has the burden of proof of establishing want of probable cause, nevertheless, since want of probable cause involves a negative, slight proof thereof is all the law requires to make a prima-facie case. [Williams v. Vanmeter, 8 Mo. 339; Brown v. Selfridge, 224 U. S. 189; Douglas v. Kenney, 40 Idaho, 412, 233 Pac. 874.]

(a) The basic theory of the petition is that Lamping falsely testified that plaintiff voluntarily confessed that she stole the beaded bag; that she freely and voluntarily signed a statement or confession to that effect; and she was informed that, if she signed it, no one would be told that she was accused of a crime.

At the police court trial, resulting in plaintiff's conviction, Lamping testified that plaintiff said, after first denying it, in response to a statement by the detective that she had stopped plaintiff on the sidewalk and that the bag was concealed under her cape, "It is the truth," and that she admitted all the facts. Relative to the signing of the confession, he testified that plaintiff at first denied the statement was true, but on the second inquiry she admitted it and signed it. Opposed to that, we not only have the testimony of plaintiff that she was partly in and partly out of the door matching the bag with shoes in the show case while draped over her knee, and that, at the time of signing the statement, she said, "I will sign, this, Mr. Lamping, not because I am guilty, but because I am going to get out of this office," but we have, opposed to his police court's testimony, the trial testimony of Lamping himself, reading:

"Q. Now, when she signed the confession, the one that was finally signed, when she signed it, did she say it was not the truth? A. She did.

"Q. She did? A. She did, she said she was merely matching the bag with the shoes in the window.

"Q. I see, yes, and when she finally signed the confession she said the confession was not the truth? A. She said it was not the truth, and added that to it, yes, sir."

In addition, plaintiff's evidence develops that she was told that, if she signed the confession, it would never be known outside the room unless she was again caught stealing.

In view of the state of the record, we need not determine whether the signed confession was admissible in evidence (however, see State

v. Hunter, 181 Mo. 316, l. c. 336, 80 S. W. 955). It is sufficient to say that a confession obtained under such circumstances does not of itself show probable cause, for the act of signing it, while denying its verity, by one in a nervous condition, for the purpose of escaping duress, and under the promise of secrecy and implied non-prosecution, renders the confession valueless. Under these circumstances defendants were apprised by plaintiff, *dum fervet opus*, that the confession was not true, and, in the face of this denial of its truth, which they admit she declared, they proceed to prosecute her notwithstanding. Moreover, Lamping was the office manager of defendant corporation and was acting in the matter of the prosecution for both the corporation and Packwood. His knowledge was the knowledge of both of them, for he obtained it while acting within the scope of his employment. Consequently, Lamping knew, and therefore the corporation and Packwood knew, as developed by Lamping's trial testimony, as well as that of plaintiff, that his police court testimony, that plaintiff freely and voluntarily admitted signing the confession and that she then said it was true, was false. Such testimony could and probably did actuate the police judge in adjudging plaintiff guilty.

(b) The detective, while acting within the scope of her employment, arrested plaintiff and conducted her to defendants' office. She advised the defendants that she found plaintiff on the sidewalk departing, with the bag under her cape, when she arrested her. Her knowledge of the transaction, for she was acting within the scope of her employment, is charged to defendants. If she was not telling the truth, they are held to have known it. Plaintiff was listed for prosecution, in part at least, on the detective's statement to Packwood and Lamping that plaintiff stole the bag. Defendants caused the detective to testify in the police court. Plaintiff's testimony unequivocally denied that she intended to steal the bag, and tended to show, in accordance with a custom, that she took the bag to the light to examine it, and to the door to ascertain if its color matched a pair of shoes in the show case in the lobby. Plaintiff's evidence tended to show that the detective's evidence was false, and, because they permitted the detective to so testify when charged with such knowledge, the conflict of testimony renders the existence of probable cause for the prosecution a jury question.

(c) It is immaterial under the record facts and circumstances that defendants did not know plaintiff's reputation. They are responsible for facts they could have known by reasonable inquiry and diligence. There was in defendants' employ in the store on other floors, two women whom plaintiff requested Packwood and Lamping to call. These two women had resided in plaintiff's

home. Other persons in near-by places were also referred to by plaintiff. Defendants refused to call anyone. Plaintiff's reputation at each trial was shown to be good; in fact, it was not attacked. Defendants knew, or ought to have known, that one with a good reputation is less likely to be guilty of a crime than one with a bad reputation. Plaintiff was maintaining her innocence against a charge made by a single witness, under circumstances that suggested, at least, mistaken and erroneous deductions. By their refusal to investigate plaintiff's reputation, under the rule that slight evidence of a negative is all the law requires to make a prima-facie case, the want of probable cause is shown. [Stubbs v. Mulholland, 168 Mo. 47, 67 S. W. 650; Rosendale v. Market Square Dry Goods Co., 213 S. W. 169.]

(d) The subsequent acquittal of plaintiff in the appellate court, on appeal from a conviction in the police court, rendered the question of probable cause a matter for the jury to decide, as we have determined. And, in connection with other circumstances in the case, plaintiff's acquittal in the appellate court was evidentiary of the want of probable cause. [Rosendale v. Market Square Dry Goods Co., 213 S. W. 169; Hanser v. Bieber, 271 Mo. 326, 1. c. 342, 197 S. W. 68.]

(e) After plaintiff arrived at the police station under arrest, she was examined by the chief of detectives, which was antecedent to the filing of the charge. The following is shown by the record: Lamping had telephoned the city chief of detectives and had directed that he send for plaintiff. After talking to plaintiff, the chief sent her into an adjoining room and talked to Lamping over the telephone. This question was asked and this answer returned: "Q. Well, what did you say to Mr. Lamping after you talked to this woman? A. I said to him, 'Now that I have talked to this woman quite a little while, will you prosecute her?' He said 'Yes,' and in substance I told him I believed what she had told me to be the truth. 'Well,' he said, 'We will prosecute her.'" On motion, the court struck out the personal belief of the witness, and plaintiff objected and excepted.

Inasmuch as the charge had not been filed, this evidence was clearly admissible as a part of the res gestae. While the chief's belief was a conclusion, it was a conclusion communicated to defendants after an examination of the fact. The avocation of the chief qualified him to pass upon the verity of facts, and his communication to Lamping warned, or should have warned, defendants that their deductions were possibly questionable and equivocal surmises and suppositions. The communication, as above related, developed a jury question as to probable cause for the prosecution.

(f) Defendants maintain, notwithstanding the acquittal of plaintiff, that the facts and circumstances, as they appeared to them, de-

veloped probable cause for the prosecution. Their contention is based on the hypotheses and deductions that plaintiff admitted taking the bag outside the door; that she did not ask permission to do so; that she made no visible attempt to get permission; that she knew the custom and knew she was violating the custom of stores; that she refused to explain, when apprehended, and remained silent some twenty-five minutes after being questioned by Lamping.

The record does not advise us that plaintiff admitted taking the bag outside the door, or off the premises of defendants. She stated that she was partly in and partly out the door, which was twenty-five feet from the sidewalk, draping the bag over her knee to match it with the shoes. Under these circumstances, she was still on the premises of the defendants. She admitted that she did not ask or attempt to obtain permission to take the bag to the light or the door, and admits that a custom denied her the right to take goods outside the store, but if plaintiff's evidence as to the event was true, and that was a jury question, the scene depicted advised the detective that plaintiff was merely matching merchandise, without intent to steal it. It is true that plaintiff admitted that, for about twenty-five minutes, she did not advise Lamping personally that she was matching the bag with the shoes, but the detective said that plaintiff told her in the office that she was matching the blue bag with the blue shoes, and the detective said the blue shoes were in the window of the lobby near the door. But, notwithstanding she denied stealing the bag from the beginning, she was met with repeated assertions that she was a clever thief and shoplifter, and that she was guilty, so that, by common knowledge, we may infer that humiliation and nervousness divested her of normal power to reason. Under all the facts and circumstances submitted by the proof, we think that probable cause for the institution of the prosecution was a jury question.

VI. The fifth element is malice. Malice may be inferred from want of probable cause. [Irons v. Express Co., 300 S. W. 283; 18 R. C. L. 30.] The evidence tends to show that Lamping or Packwood said, in substance, that they would provide protection against a damage suit. If that was their purpose, the prosecution of plaintiff did not emanate from a desire to bring the accused to justice, but rather from a desire to protect themselves against damages. The prosecution of one for that reason is similar to a prosecution to compel one to pay a debt. The inference of malice from the want of probable cause is one of fact to be drawn by the jury, but the jury are not required to find it merely because they find want of probable cause. An action for malicious prosecution

cannot be sustained, unless there is a finding of malice. The proof develops inferences of malice toward plaintiff in prosecuting her.

VII. Defendant contends that the original action did not terminate in favor of plaintiff, because the Circuit Court of Jackson County, in which court the cause on appeal was tried, was without jurisdiction on appeal to determine the issues and to acquit plaintiff.

The facts develop that plaintiff was arrested June 16, 1923, and the charge, as set out in our statement of facts, was filed against her in the police court on June 18, 1923. She was tried in the police court and found guilty, and on June 28, 1923, an appeal was taken, perfected and allowed her to the Criminal Court of Jackson County, but the appeal was sent to and lodged in the Criminal Division of the Circuit Court of Jackson County, in which court plaintiff herein, defendant therein, was tried and acquitted by a jury on September 28, 1923. The 1908 Charter of Kansas City, which was in force when the cause was tried in the police court and the appeal was taken (Art. IV, sec. 10), reads: ''Appeals may be taken from the Municipal Court to the Circuit Court of Jackson County, Missouri, in all cases except the imposition of fines and penalties for the breach of any ordinance, in which case the appeal shall be to the Criminal Court of Jackson County.'' The Laws of 1921, page 220, abolished the Criminal Court of Jackson County, effective on the first Monday in January, 1923. We need notice Section One of the act only. It reads:

''On the first Monday of January, 1923, the criminal court of Jackson County and the office of judges and clerk thereof shall be abolished, and all jurisdiction and powers then vested in said court or the judges thereof shall be transferred to, vested in, and thereafter exercised by the circuit court of the 16th judicial circuit, composed of Jackson County, as said court will on that day be constituted under the Constitution and the laws then in force, and thereafter said circuit court and judges thereof shall have the same jurisdiction in criminal cases and matters arising in said county that under the Constitution and laws is and may be vested in other circuit courts of this State.''

On February 24, 1925, the electors of Kansas City, empowered by Article IX of the Missouri Constitution, adopted a new charter, which went into effect on April 10, 1926. The section relating to appeals from the municipal or police court reads: ''Appeals may be taken from the Municipal Court to the Circuit Court of Jackson County, Missouri, in the manner and upon the conditions prescribed by ordinance.'' Article IX, Section 16, of the Missouri Constitution, provides, in substance, that any city having a population of over one

hundred thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State.

It is the contention of defendants that the power to provide for appeals from municipal courts was lodged in the Kansas City Charter exclusively, and, because the charter provision then in force permitted appeals to be taken only to the Criminal Court of Jackson County, the abolishment of the said court left an accused without a tribunal having appellate jurisdiction in the premises. Consequently they say that the judgment and proceedings in the circuit court on appeal, acquitting plaintiff, were void.

We do not so view the situation. An accused was accorded, by force of the Kansas City Charter then active, the right to an appeal from a conviction for the violation of an ordinance. According to the charter, this was, at the time of plaintiff's appeal, a paramount and guaranteed right. The Criminal Court of Jackson County was a creature of the State, not of Kansas City. Therefore the State could abolish it, which it did. However, the statute did not abolish plaintiff's right of appeal guaranteed to her by the charter. But, while the court was abolished, there was substituted in lieu thereof another court, to-wit, the circuit court, which was expressly vested with all jurisdiction and powers of the defunct court. Thus Section One not only transferred and vested in the Circuit Court of Jackson County all jurisdiction and powers theretofore vested in the abolished Criminal Court of Jackson County, but provided that said circuit court shall have the same jurisdiction in matters arising in said county that, under the Constitution and laws, is and may be vested in other circuit courts of this State. It is clear that the substituted court, that is, the circuit court, had jurisdiction on appeal from municipal court findings. The jurisdiction of the Criminal Court of Jackson County embraced appeals from judgments of the municipal courts as to fines and penalties. Consequently, when that court, created by the State, was abolished, the State, as was done in this instance, had the right and power to confer and vest its jurisdiction in a competent court. The Laws of 1921 did not undertake to regulate the charter provisions. They merely substituted one court for another court. To hold that the circuit court did not have jurisdiction of appeals would deny an accused the right of appeal, which the charter secured. Moreover, the contention, in effect, denies the right of the General Assembly, when the Constitution does not prohibit it (see Sec. 31, art. VI, Constitution of Missouri), to abolish a court and to transfer its jurisdiction to another court. We think that, in conformity with the charter and the statute, the Circuit Court of Jackson County had jurisdiction of the appeal from the police court.

Defendants further complain as follows: "The act (Laws 1921, p. 220) if it was intended to affect appeals from the municipal courts of Kansas City, contains more than one subject, in contravention of Section 28 of Article IV of the Constitution of Missouri, and contravenes as well Subdivisions 4, 32 and 33 of Section 53 of said Article IV, and Section 54 of said Article IV of said Constitution of Missouri." Defendants do not further argue the contentions. We have considered the contentions and are unable to agree that the act, which related to the administration of justice in Jackson County, contained more than one subject or that the General Assembly passed a local or special act in violation of the sections of the Constitution mentioned. Moreover, this court, en banc, in State ex rel. Garvey v. Buckner, 308 Mo. 390, 272 S. W. 940, determined these contentions against defendants.

The judgment is reversed and the cause remanded with direction to the court *nisi* to set aside the involuntary nonsuit suffered and taken by plaintiff and to grant plaintiff a new trial. *Henwood. C.*, concurs; *Cooley, C.*, not sitting.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.