CATHERINE HIGGINS v. KNICKMEYER-FLEER REALTY & INVESTMENT COMPANY, a Corporation, and ARNOLD J. FLEER, Appellants.

CATHERINE HIGGINS v. JOSEPH BOXERMAN, Appellant.—74 S. W. (2d) 805.

Division One, September 18, 1934.*

*NOTE: Opinion filed at May Term, 1934; July 17, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.

*McDonald & Just* and *Edwin C. Luedde* for Knickmeyer-Fleer Realty & Investment Company and Arnold J. Fleer.

*Allen, Moser & Marsalek* for Joseph Boxerman.

*Taylor R. Young* and *Herbert E. Barnard* for respondent.

FERGUSON, C.—Action for damages for alleged malicious prosecution. The Duke Realty Construction Company, a corporation, Sam Duke, Joseph Boxerman, Knickmeyer-Fleer Realty & Investment Company, a corporation, and Henry Knickmeyer, A. J. Fleer and Charles Dietrich, members and officers of said corporation, were made defendants. During the trial plaintiff dismissed as to defendants Henry Knickmeyer and Charles Dietrich. A verdict was returned finding the issues for plaintiff against the other defendants and awarding plaintiff "actual damages in the sum of $1000 and punitive damages at the sum of" $15,000; judgment was entered accordingly. All the defendants, except the Duke Realty & Construction Company appealed. The joint-separate appeal of defendants Knickmeyer-Fleer Realty & Investment Company and A. J. Fleer is here numbered 32,087, the separate appeal of defendant Joseph Boxerman 32,088 and that of defendant Sam Duke 32,089. Abstracts have been filed and separate briefs and arguments submitted on the part of appellants, the Knickmeyer-Fleer Company, Fleer and Boxer-

man. The appeal (32,089) of defendant Sam Duke was dismissed here for failure of appellant to comply with our rules.

The trial, in the Circuit Court of the City of St. Louis, consumed five days and the record here is voluminous. We shall, however, endeavor to make a preliminary statement of the events leading to the situation out of which this action arises. Defendant Boxerman is an attorney. He had been engaged in the practice of law in the city of St. Louis since 1912. In 1927 and for some years prior thereto, he rented and occupied a suite of office rooms in the Central National Bank Building. Defendant Sam Duke was engaged in the real estate and building construction business. It seems he carried on this business by and through a corporation, Duke Realty & Construction Company. Duke owned the entire stock of this corporation except qualifying shares. Duke rented from Boxerman, and occupied, office space in Boxerman's office suite. Harry N. Soffer, who is spoken of as ''a young attorney,'' also had an office in the Boxerman suite and did some work for Boxerman for which he received his rent and a salary. He also carried on his separate and individual law practice. Boxerman was employed as attorney by and represented Duke, and the Duke Realty & Construction Company, in most of the legal matters arising in the course of Duke's real estate and business activities. The plaintiff Catherine Higgins, a single woman, was about thirty years of age in 1926 when she entered, with Duke, upon the construction enterprise to which we shall presently refer. Prior thereto Miss Higgins had made some three or four real estate deals. With a view to improving and erecting thereon flat and apartment buildings, an aunt of Miss Higgins, who had title thereto, free and clear of any encumbrance, conveyed to her contiguous lots fronting on Euclid, Kossuth and Farlin Avenues, in the city of St. Louis. It was agreed that the aunt would be paid a certain fixed purchase price for these lots out of the profits expected to be realized upon the sale of the buildings to be erected thereon. The scheme was most ambitious for it seems Miss Higgins had very little capital on hand. She entered into negotiations with Duke which resulted, in November, 1926, in a contract between them whereby Duke agreed to construct on the vacant lots, which had been conveyed to Miss Higgins by her aunt, six buildings as follows: an eight-family apartment fronting on North Euclid Avenue known as 4210 North Euclid; a four-family flat on Kossuth Avenue, numbered 4892-4894 Kossuth; a two-family flat on Kossuth, numbered 4896 Kossuth; and three separate, detached, two-family flats on Farlin Avenue, numbered 4893-4895-4899 Farlin Avenue. Miss Higgins was to finance the buildings by the means of first and second deeds of trust against the property. Further details of this agreement between Miss Higgins and Duke are immaterial here. It will

be noted that neither Boxerman, Fleer or the Knickmeyer-Fleer Company, the other defendants in this malicious prosecution action, had any connection with the negotiations between Miss Higgins and Duke or the contract for the construction of the buildings which they entered into. As the writer recalls Boxerman did not even draft the contract. The defendant Knickmeyer-Fleer Realty & Investment Company, a corporation, was engaged in a general real estate and real estate investment business in the city of St. Louis with offices on North Grand Avenue. The defendant Henry Knickmeyer, dismissed by plaintiff, was president of the corporation and defendant-appellant A. J. Fleer, vice president and treasurer. Respondent concedes the Knickmeyer-Fleer Company to be ''a high grade, reputable real-estate'' company. In November, 1926, in order to finance the construction work Miss Higgins executed and issued first deeds of trust against the property for amounts as follows: Euclid Avenue property, $20,000; 4892-4894 Kossuth Avenue, $10,000; 4986 Kossuth Avenue, $5500; and $7000 on each of the three Farlin Avenue flats, $21,000. These first deeds of trust on the Euclid Avenue property, 4892-4894 Kossuth and 4896 Kossuth were negotiated to the Knickmeyer-Fleer Company. The moneys paid out thereunder for construction were paid out only on written orders signed by both Miss Higgins and Duke. There is no least intimation of any irregularity whatsoever on the part of Knickmeyer-Fleer. The first deeds of trust against the three Farlin Avenue buildings were handled by other parties. For the purpose of further financing the construction work Miss Higgins, in March, 1927, placed second deeds of trust, in which Boxerman was made trustee, on the Euclid Avenue apartments, 4896 Kossuth and each of the three Farlin Avenue flats. These second deeds of trust secured a series of installment notes. Boxerman seems to have negotiated the notes, or some of them, secured by the second deeds of trust on 4896 Kossuth and the three Farlin Avenue flats to various clients. Apparently no second deed of trust was placed on 4892-4894 Kossuth. In April, 1927, Miss Higgins sold the property at 4892-4894 Kossuth to Barnard Finke and wife subject to the first deed of trust thereon for $10,000 held by the Knickmeyer-Fleer Company. The sale of this property to the Finkes is described in the case of Finke v. Boyer, 331 Mo. 1242, 56 S. W. (2d) 372. The sale was made by Miss Higgins through a real estate agent named Kelly and apparently neither Duke nor Knickmeyer-Fleer represented or acted for her in the sale of the property. The purchase price of $24,500 was paid by the Finkes assuming the Knickmeyer-Fleer deed of trust, assigning a second deed of trust, which they owned, against property at Compton and Franklin in St. Louis and which had originally been for $15,000 but had been reduced by payments thereon to $10,800 and the balance in cash.

Miss Higgins conveyed the 4892-4894 Kossuth property to the Finkes by warranty deed subject only to the Knickmeyer-Fleer first deed of trust. There were certain outstanding, unpaid, lienable claims for material and labor against the buildings constructed by Duke and as security for the payment of such of these as were properly chargeable to 4892-4894 Kossuth conveyed by her, as aforesaid by warranty deed, to the Finkes and as protection to the Knickmeyer-Fleer first deed of trust thereon, Miss Higgins deposited the $10,800 second deed of trust on Compton-Franklin property received from the Finkes with Knickmeyer-Fleer as she says "in escrow as collateral against mechanic's liens" on this 4892-4894 Kossuth property. It was agreed that any time she procured a buyer for the $10,800 deed of trust Knickmeyer-Fleer would "turn it over" to her and that "as much out of it" as might be required to "clear up the outstanding, unpaid bills on 4892-4894 Kossuth" would be "turned over to Knickmeyer-Fleer" for that purpose. Miss Higgins seems to have made the arrangement of her own initiative. The buildings were substantially complete, but for some time a dispute had waged between Miss Higgins and Duke about the costs of construction; Miss Higgins was not satisfied with and questioned the correctness of such reports and accounting as Duke, from time to time, made to her. Boxerman, as attorney represented Duke in conferences between the parties. Certain of the installment notes secured by the second deeds of trust matured and Miss Higgins was either unable to meet the notes or refused to do so and Boxerman, as trustee, commenced foreclosure proceedings under the second deed of trust against the Farlin Avenue property. Miss Higgins testified that she ceased to speak to Duke or Boxerman. About May 15, 1927, she employed an attorney Mr. David Baron who immediately entered into negotiations with Boxerman, representing Duke, seeking to bring about an adjustment or settlement of the controversy between Miss Higgins and Duke relative to the real estate and building construction transactions. Numerous conferences were had at some of which Miss Higgins, Baron, Duke and Boxerman were all present. An agreement was finally arrived at and a contract was drawn embracing the agreement. This contract was duly signed and executed by the parties on June 9, 1927. While the negotiations were in progress Miss Higgins arranged to sell the $10,800 second deed of trust on the Compton-Franklin property to a Mr. Diesing, who was connected in some capacity, or at least had an office, with the real estate firm of Oren and R. G. Scott. Diesing agreed to pay her $7,500 for the $10,800 deed of trust. So far as appears this deal with Diesing was made by Miss Higgins personally; none of the defendants were in any manner connected therewith. The differences between Miss Higgins and Duke having been composed and a contract settling and ad-

justing all matters in controversy drawn a meeting was called for three o'clock in the afternoon of June 9, 1927, to be held at the Scotts' office. Mr. Baron notified the Knickmeyer-Fleer Company to have Miss Higgins' $10,800 second deed of trust on the Compton-Franklin property, which it held in the manner and for the purposes above related, at this meeting. Pursuant to the request of Baron, Mr. Fleer took the deed of trust at the appointed time to Scotts' office. We come now to the events bearing more directly upon the issues involved in this action. Miss Higgins, her attorney, Baron, Duke and his attorney Boxerman, Fleer and Diesing were present at this conference of June 9. Baron read the contract aloud. Miss Higgins and Duke approved and signed same and each was supplied with a copy thereof. This contract provides and states; that Duke is to purchase the Euclid Avenue property subject to the first and second deeds of trust thereon, assuming and paying the indebtedness secured thereby, and all liens of every kind arising out of the construction of said building, paying Catherine Higgins therefor $2503.50 plus all expenses incurred and paid by her for street, alley, sidewalks and improvements made and assessed against the lot; and she to execute a quitclaim deed conveying said property to Duke; that Duke would accept $5225.45 as and in full payment of the account due from Catherine Higgins "on account of the construction" of the 4892-4894 Kossuth Avenue property (sold to the Finkes) and that Catherine Higgins would "deposit forthwith with Knickmeyer-Fleer Realty and Investment Company" the said sum of $5225.45 "to be paid out" by the Knickmeyer-Fleer Company "on duly executed orders signed by" Duke for work and materials furnished on 4892-4894-4896 Kossuth "and any amount" that Duke "is under obligation to pay under the terms of this agreement on account of" the three Farlin Avenue buildings . . . "the balance to be paid to" Duke when he produced "clear releases of liens from all persons and companies who supplied labor or materials used in the construction of" 4892-4894 and 4896 Kossuth; that the agreement theretofore existing concerning the deposit of the $10,800 deed of trust with Knickmeyer-Fleer "was no longer to be in force" and that deed of trust and the notes secured thereby to be delivered to Catherine Higgins; Duke represents that he has "paid for all work and materials used in the construction of" the three Farlin Avenue houses except five items which with the amounts thereof and to whom owing are listed and all of which Catherine Higgins "assumes and agrees to pay" and Duke agrees to give a surety bond in principal sum of $5000 securing Catherine Higgins against all other liens, of every kind, arising out of the construction of said buildings; that "all matters and disputes of every kind and character arising out of any contact heretofore entered into between the parties are hereby fully

settled;" and it is then further provided that Catherine Higgins would pay the installment notes then due and unpaid, secured by the second deeds of trust on the Farlin Avenue property, on account of default in the payment of which Boxerman as trustee had commenced foreclosure proceedings, thereafter pay said installment notes as they matured, pay costs of foreclosure notices and that Boxerman would withdraw the notices and not proceed further with such foreclosure. Boxerman also signed the contract. Pursuant to the contract Miss Higgins executed and delivered a quitclaim deed to Duke conveying to him the Euclid Avenue property and he delivered to her his check of that date for $2503.50 and Miss Higgins then delivered to Duke her check, of date June 9, 1927, for $5225.45, payable to the order of Duke Realty & Construction Company, drawn on the Mercantile Trust Company. Thereupon, and forthwith Duke endorsed Miss Higgins' check: "Pay to the order of Knickmeyer-Fleer Realty and Investment Co., to be held in escrow and paid out as per contract," and delivered the check to Fleer who at the same time delivered the $10,800 Compton-Franklin second deed of trust to Miss Higgins. Miss Higgins' attorney Baron then wrote a receipt on each copy of the contract and same was signed by Fleer as follows: "Received check for $5225.45 to be held in escrow and paid out under the terms of the above agreement. Knickmeyer-Fleer R. & Inv. Co., A. J. Fleer, V. Pres. and Treas." After the signing of the contract Miss Higgins gave Boxerman, as trustee in the second deeds of trust then in foreclosure, her check for, as the writer recalls, approximately $900 covering the installment notes then due and unpaid and the costs of foreclosure notices as provided by the contract. This check was paid in due course. It will also be noted here that Duke's check to Miss Higgins was paid and that she received and retained the proceeds thereof. The surety bond Duke was to give was furnished. It will be observed that by the terms of the Higgins-Duke contract Knickmeyer-Fleer was to hold the proceeds of Miss Higgins' $5225.45 check, and pay therefrom, on properly signed orders, all claims and demands then unpaid for labor and materials in the construction of 4892-4894 Kossuth (theretofore sold and conveyed by Miss Higgins by warranty deed to the Finkes) and 4896 Kossuth, upon all of which Knickmeyer-Fleer had financed the first deeds of trust as well as like claims against the Farlin Avenue property which under the contract Duke was obligated to discharge, the balance remaining, if any, after clear releases of all such claims had been obtained to be paid to Duke. The claims which the $10,800 deed of trust had been originally deposited with Knickmeyer-Fleer to secure were included in and covered by this $5225.45 check. It seems Miss Higgins' arrangement or agreement with Diesing for the purchase of the $10,800 deed of trust contemplated the payment of the agreed purchase price

thereof $7500 at this time, but Diesing informed her that he could not close the deal that afternoon but would give her a check for the purchase price by nine o'clock the next morning, June 10. Miss Higgins testifies that she thereupon "told everybody—they were all there—don't gallop to the Mercantile Trust before 9 o'clock in the morning because I have to wait for Mr. Diesing" and "don't gallop over to the Mercantile Trust Company before 9 o'clock in the morning because this won't be in there" referring to the check she had issued and delivered to Duke and which had been by him endorsed and delivered, pursuant to the contract, to Knickmeyer-Fleer and was then held by Fleer. Baron, Boxerman, Duke, Fleer and Diesing were all present at the time. At the same time she says she told Fleer: "Don't go right over to the Mercantile Trust Co., because I will have to go to Scotts (meaning on the following morning) and it will take me some little time to get this check and go over to the Mercantile Trust with it." On the next morning Miss Higgins went to Scotts' office for the purpose of closing the deal with Diesing, but he then told her that he had decided not to purchase her deed of trust, not being satisfied with the value of the Compton-Franklin property, and refused to carry out his agreement. About eleven o'clock that morning Fleer took Miss Higgins' check to the Mercantile Trust Company and asked for a cashier's check, which was refused on the ground of insufficient funds. Fleer returned to his office and deposited the check, in regular course, in the bank with which the firm carried its account. The check then went through the usual channels, payment was again refused and the check returned with notation by the drawee attached that payment was refused on account of insufficient funds. The check was never paid. Some time in the afternoon of June 10, Miss Higgins and Baron went to the office of Knickmeyer-Fleer and she says that at that time she told Fleer that "Diesing backed out of that deal" and "asked them to give me a little time." It is difficult to enumerate all, or with continuity, the ensuing circumstances, conversations and events. Clearly Knickmeyer-Fleer understood and believed, and were so assured by both Miss Higgins and Baron, shortly after payment of the check was refused, that Miss Higgins intended to and would arrange to pay the check. Duke proceeded to issue orders on Knickmeyer-Fleer to the various claimants, who held lienable claims for labor and materials, for amounts due them which the contract provided were to be paid out of the proceeds of this check. Confusion resulted; Knickmeyer-Fleer had to refuse payment of these orders and try to pacify the claimants with the assurance the money would be forthcoming within a few days. Miss Higgins says that she did, at first, undertake to sell the Compton-Franklin deed of trust with the intention of applying the proceeds to the payment of the check. On June 11

or 12, Baron offered to purchase the deed of trust and pay $7500 cash which was a better offer than Diesing had made in that Diesing was to pay part only of the purchase price in cash executing a note for the balance. Baron testified that at the time he made the offer and while same remained in effect he was financially able to make it good. However, Baron told Miss Higgins at the time he made the offer that "if she could get as much or more from anyone else to do so." She told Baron she was negotiating a sale to another party who she thought would pay her more than $7500. It seems that within but a few days following the signing of the contract Miss Higgins concluded, and became of the opinion, that Duke had not, during the negotiations leading up to the settlement, correctly accounted to her on the building transactions. She says that within a few days after the execution of the contract she "had a fight (presumably a verbal battle) with Duke and told him what she thought." She testified that she "never promised to make the check good" after she "found out what it was all about;" that thereafter she didn't make any "terrible" effort to take care of the check; that after she "found out what kind of a fix" she "was in" she resolved that she "never would make that check good" and "made no effort to make it good." She ceased counseling with Baron and employed another attorney, a Mr. Barnard. Eleven days having passed and Miss Higgins having failed to take care of her check and apparently having become wholly indifferent about the matter Boxerman wrote Baron under date of June 21, and after reference to certain notes secured by the second deeds of trust on the Farlin Avenue property said: "wish to advise that if check of $5225.45 payable to Duke Realty & Construction Co., is not made good at once I shall start action against Catherine Higgins." Thereupon Miss Higgins went to see Boxerman. On that occasion she said she told him: "You won't have me arrested" and that he said: "I certainly will if you don't bring that money in here. We are not going to fool any more with you." About this time she says Fleer told her that he had formerly been in the banking business and was familiar with banking law and that "it is a pretty serious proposition to give a check upon a bank if you haven't money in the bank to take care of it for you can be prosecuted for doing so." Miss Higgins did not avail herself of Baron's offer to purchase her deed of trust and under date of June 22, he wrote to her. Baron's letter was in part as follows: "I was acting in the best of faith when I brought about the agreement between you, Mr. Duke and Mr. Boxerman . . . When Mr. Diesing refused to purchase your second deed of trust . . . I made you a proposition to the effect that I would buy your deed of trust for $7500 in cash, which was better than the proposition made by Mr. Diesing in that he was to pay part of the $7500 by promissory note. This offer

was made by me so that you would have money wherewith to meet the check that you had issued and which was returned unpaid on account of insufficient funds. I told Mr. Duke and Mr. Fleer what I proposed to do. Since you have seen fit not to accept my offer I hereby withdraw same.'' On June 23, the Knickmeyer-Fleer Company, by letter, gave Miss Higgins formal notice that it held her check dated, June 9, 1927, for $5225.45 drawn upon the Mercantile Trust Company, payable to Duke Realty & Construction Company, and duly endorsed to it; that said check had been returned by the Mercantile Trust Company, marked ''insufficient funds'' and concluded: ''We must ask that you kindly call at our office and take up this check at once; otherwise we will be obliged to turn same over to the Prosecuting Attorney's office.'' Miss Higgins ignored the notice and five days later, June 28, the prosecuting attorney filed an information charging Miss Higgins with uttering and delivering the check with intent to defraud knowing she had not sufficient funds in, or credit with, the bank upon which same was drawn for the payment thereof in full upon its presentation. [See Secs. 4305-4306, R. S. 1929.] The information was not based upon or accompanied by the affidavit or complaint of either of the defendants or any private person, but upon the information and belief of the prosecuting attorney and verified by him upon his official oath. On the same day a warrant was issued and a deputy sheriff served the warrant by placing Miss Higgins under arrest. She had on the afternoon of that day advised her new attorney, Barnard, that she expected to be filed against. When the warrant was served she was not placed in jail but called Barnard by telephone. He joined her and the deputy sheriff and an appearance bond for $200 was arranged for and given. Plaintiff called Soffer, whom we introduced in the early part of this narrative as a young lawyer working in Boxerman's office and also doing individual practice, as a witness. He said he accompanied Duke to the office of the prosecuting attorney; that Duke wanted to consult the prosecuting attorney about this Higgins' check; that Duke did not have the check and by telephone requested Fleer to bring the check to the prosecuting attorney's office; that when Duke and he arrived at the prosecuting attorney's office Fleer was waiting in the outer office and that, as he recalls the incident, either Duke or he took the check from Fleer and that Duke and he then went in for a consultation with the prosecuting attorney and that ''Fleer remained in the outer office.'' There seems to have been but one visit to the prosecuting attorney's office by either Duke or Fleer and that must have been about the 22nd or 23rd of June when it became manifest that Miss Higgins was not making any effort to take care of her check and had determined to avoid payment thereof. Duke testified that Boxerman advised him to lay the matter before

the attorney and delegated Soffer to accompany him and present the matter; that Boxerman said it would be necessary to get the check from Knickmeyer-Fleer so that it could be exhibited to and examined by the prosecuting attorney; that Soffer told him he would meet him at the prosecuting attorney's office "in an hour;" that he then drove to Knickmeyer-Fleer's office and requested that the check be turned over to him and explained what he "wanted it for;" that they refused to release the check, said they "held it in escrow and were responsible for it;" that he then proposed that they send the check by some member of their firm and that Fleer offered to take the check to the prosecuting attorney's office if Duke would drive him there and bring him back; that Fleer went with him to the prosecuting attorney's office; that Soffer was there in consultation with the assistant prosecuting attorney when they arrived; that the assistant prosecuting attorney, Fania (who handled the matter throughout) "seemed to know all about the case already;" that he asked him (Duke) a few questions; that Fleer exhibited the check, the prosecuting attorney examined same, made some memoranda therefrom and returned the check to Fleer; that Fleer made no request to the prosecuting attorney nor did he do or say anything concerning the matter, except exhibit the check when requested; that he returned Fleer to his office and Fleer took the check with him. Fleer's testimony was to substantially the same effect. Mr. Fania, the assistant prosecuting attorney who filed the information and handled the case throughout was called as a witness by plaintiff. It will be remembered that the matter was referred to the prosecuting attorney in June, 1927, and this trial was four years later, in June, 1931. Fania stated that his "recollection is hazy about the transaction;" that he served seven and a half years as assistant prosecuting attorney and that he handled a number of these check cases daily; that "because of the unusual size of this check" he recalls some of the circumstances of this case; that his impression is that Fleer came alone to see him though he will not be positive that Duke was not there at the same time; that no one requested him to begin a prosecution or take any action against Miss Higgins; that Fleer exhibited the check and said merely that "he came there to find out what could be done;" that he had a stereotyped form of questions that he asked "concerning checks of this kind" and that he always propounded these questions and apparently noted the answers; that some of these questions had to do with the consideration for the check and why payment was refused; that it is impossible for him to recall the exact conversations; that he always made his own private investigation before filing information; that he always required the holder of the check to give the maker five days' notice and after the expiration of that time he would call the maker by telephone,

if he or she could be reached by telephone, before taking action or if he could not reach the maker by telephone he would write a letter; that he distinctly recalls following that procedure in this instance, but that when he called Miss Higgins she "bawled me out and hung up" and that he promptly issued and filed the information; that he "probably acted upon his own initiative;" that the information derived from the regular form of questions propounded, his own investigation and what Miss Higgins said "seemed sufficient to me;" that no one "lodged an affidavit with me;" that "I signed the information and swore to it in my official capacity on my information and belief;" that "in issuing that warrant I acted on what was on the check, what Miss Higgins said and my experience as to what was a violation of the law and what I had already ascertained was the consideration for the check;" that without further taking the matter up with the parties who first presented it he "might have issued the warrant on account of the attitude of Miss Higgins when I called her by telephone." Only the name of Duke was endorsed upon the information as prosecuting witness. The case was set for trial July 13, 1927, in the St. Louis Court of Criminal Correction. Defendants Boxerman and Fleer were subpoenaed as witnesses for defendant. On July 13, the case was, upon a change of venue taken by defendant, reset for trial on July 27, and on that date, when called, was dismissed by the Assistant Prosecuting Attorney Fania. On the day before, July 26, Miss Higgins' new attorney, Barnard, filed on her behalf, an equity suit in the Circuit Court of the City of St. Louis wherein she was plaintiff and Duke and Boxerman were made defendants charging fraud in connection with Duke's building and construction transactions and seeking an accounting. Neither the Knickmeyer-Fleer Company nor Fleer were made defendants in that suit. Soffer was present in the Court of Criminal Correction on July 27, and says he was there as attorney for and representing Duke. Soffer testifies, that Barnard that morning proposed "that if it would be agreeable" to Duke "to let Fania dismiss prosecution then they would dismiss the equity suit" which had been filed the day before; that such agreement was arrived at and reported to Fania and that Fania then dismissed the prosecution. Barnard denied that he made the proposition testified to by Soffer and stated "there was nothing said by me to Soffer about dismissing the equity suit until after the prosecution was dismissed" and that he then told Soffer that he was willing to dismiss the equity suit without prejudice so that he could bring another one unless Boxerman and Duke would account to Miss Higgins for what they owed her and then he "would have Miss Higgins give them all she owed them, if anything." On the following day July 28, Barnard dismissed the equity case. The following entry was made: "Dismissed by plaintiff, without prej-

udice, at plaintiff's cost." Concerning the dismissal of the criminal prosecution Fania stated: "It was a voluntary dismissal on my part; I never dismissed a case unless both parties were in court and it was satisfactory to both of them. By both parties I mean the complaining witness and the defendant. I do not remember what occurred between them at that time. . . . I acted upon information that led me to understand and believe that everything was satisfactory between the complaining witness and the defendant." Sometime later in the same year (1927) Miss Higgins and her aunt, who had conveyed the vacant lots to Miss Higgins, as plaintiffs, instituted a new suit, also referred to as an equity suit, in which Duke, his wife Betty Jane Duke, the Duke Realty & Construction Company, Boxerman and certain other parties were made defendants. Neither Fleer nor the Knickmeyer-Fleer Company were made defendants. That suit was tried in the Circuit Court of the City of St. Louis in September, 1929. It was frequently referred to in the trial of this action and plaintiff-respondent has seen fit to set out in her brief a portion of the decree entered therein. The decree and judgment therein was against Duke and wife and the Duke Construction Company but in favor of Boxerman and all other defendants who were absolved by the trial court. The Dukes appealed to this court, but the appeal was dismissed here. However, in that case, Catherine Higgins et al. v. Sam Duke et al., No. 30,335, we have the full text of the decree and judgment of the trial court before us. The court finds that prior to November, 1926, the plaintiffs, Miss Higgins and her aunt, owned the vacant lots, whereon Duke later erected the buildings which we have described, free and clear of encumbrance; that the "fair, reasonable market value" of said vacant lots was $16,200; that Duke made fraudulent representations as to the costs of erection of said buildings and by such fraudulent representations induced Miss Higgins to enter into the contract therefor and that he failed to pay the purchase price of said lots out of the proceeds of the deeds of trust which Miss Higgins executed and sold but appropriated and used a large part of same for his own use and that as a result of Duke's acts plaintiffs lost their property. Judgment against Duke, his wife and the Duke Construction Company for $16,200, the exact value of the vacant lots as found by the court, with interest from November 15, 1926, was entered. Despite the effort of counsel for Boxerman, and counsel for Fleer and the Knickmeyer-Fleer Company to confine and restrict the evidence in this case to the issues determinative of malicious prosecution charged by the petition plaintiff succeeded in conveying to the jury, in this case, her claim that in the real estate and building construction transactions preceding the contract, in conformity with which the check was given, she had been defrauded in some manner or some way and by some

one, the implication being the defendants, and even that she had suffered an ultimate loss by reason thereof of $16,000. The verdict in this case it will be recalled was $16,000.

Appellants' first and principal contention is that no case was made for the jury and that upon their demurrers to the evidence, at the close of all the evidence in the case, the trial court should have directed a verdict in their favor. We are not inclined to rule the demurrer on the first proposition advanced by appellants in support thereof, i. e., that the evidence conclusively shows that the prosecution was instituted by the Assistant Prosecuting Attorney Fania solely upon his own initiative after making his own independent investigation. While Fania was called as a witness for plaintiff and the general tenor of, as well as certain specific statements found in, his testimony tends very strongly to support that contention yet such information as he possessed and which constituted the real basis of his action seems to have been obtained, for the most part, from defendants, either directly or indirectly, and whether they made a full and fair disclosure of all the material facts, with knowledge of which they were chargeable, concerning the issuance of the check and the refusal to pay same was, we think, an issue of fact and an affirmative defense. This is not a case where an indictment was returned by a grand jury or the person charged held for trial by a magistrate. Such proceedings have to do with the ascertainment of probable cause and constitute prima facie evidence thereof and in such case the burden of proof devolves, in the first instances, upon the plaintiff in the malicious prosecution action to show that the action of the magistrate or grand jury was obtained by false or fraudulent testimony, or other improper means, on the part of defendant. [38 C. J., pp. 411, 412.] However, the testimony of the prosecuting attorney offered by plaintiff is pertinent in connection with the question of probable cause which arises upon plaintiff's own evidence and the undisputed evidence in the case. We shall therefore proceed on the assumption that there was substantial evidence tending to show that each of the defendants, against whom judgment went and who are appellants here, in some manner contributed to the commencement of the prosecution or at least intentionally cooperated to bring it about.

In a malicious prosecution suit the necessary elements for plaintiff to establish are: (1) The commencement or prosecution of the proceeding against him or her; (2) its legal causation by the present defendant; (3) its termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage to plaintiff by reason thereof. [38 C. J., p. 386; Randol v. Kline's Incorporated, 330 Mo. 343, 49 S. W. (2d) 112; Id., 332 Mo. 746, 18 S. W. (2d) 500.] What

we have said, supra, suffices as to the first and second elements enumerated; the third requirement was met by the dismissal of the prosecution. The sixth element is a jury matter. The fourth element, want of probable cause for the prosecution, confronts us for determination upon the demurrers to the evidence. ■ The very foundation of an action for malicious prosecution is that the previous legal proceeding was resorted to or pursued "causelessly" (38 C. J., p. 397), and since it is incumbent upon the plaintiff in an action for malicious prosecution, in order to make out a case, to affirmatively show want of probable cause, the demurrers to the evidence then raise the question whether there was any substantial evidence tending to show that there was no probable cause for the prosecution; otherwise stated, if plaintiff's own evidence and the undisputed facts show any probable cause for the prosecution filed against her then plaintiff fails and the demurrers should have been sustained. [Laughlin v. St. Louis Union Trust Co., 330 Mo. 523, 50 S. W. (2d) 92.] Our statement of the case, supra, is based upon plaintiff's evidence, and the undisputed facts established by the whole evidence. Upon the demurrers to the evidence whether such facts and circumstances amount to probable cause is a question of law for the court and if such evidence shows probable cause the court should direct a verdict for defendants. ■ Probable cause is reasonable cause and may be defined as the existence of such a state of facts as would warrant an ordinarily cautious and prudent man in the belief that the accused was guilty of the offense charged. [Newell on Malicious Prosecution, p. 252; 38 C. J., p. 403; 18 R. C. L., p. 35.] It is not essential to the existence of probable cause that the evidence or facts upon which the party acted be sufficient to insure a conviction for the question of probable cause "does not turn upon the actual innocence or guilt of accused but the prosecutor's (the person causing the charge to be filed) belief in it based upon reasonable grounds." And "the test as to whether or not probable cause for instituting a criminal prosecution existed is to be applied to the facts and circumstances as they existed at the time the prosecution was commenced." [38 C. J., p. 405.]

Looking to the facts, as shown by plaintiff's evidence, and the undisputed facts, which existed at the time the prosecution against Miss Higgins was commenced we pursue the inquiry as to whether such facts constitute reasonable and sufficient grounds to warrant a belief on the part of a reasonably cautious and prudent person that she had committed the offense with which she was charged. It is well to observe here that no inference of want of probable cause arises from the fact, alone, that the prosecuting attorney voluntarily dismissed the prosecution prior to and without an examination or trial upon the merits. Such dismissal by the prosecuting attorney

is not evidence of want of probable cause (38 C. J. 416), and the only bearing it has upon this action for malicious prosecution is to establish the third element. of the action, above enumerated, i. e., that the criminal prosecution had been terminated and was at an end. Respondent argues that the check was without consideration and points to Fania's testimony when he was asked by respondent if he would have ''issued that warrant'' if he had been told that ''there was no consideration for that check'' and he replied that he would not. The argument that the check was without consideration hardly seems to require extended discussion when the contract providing for the payment by Miss Higgins of the sum of money represented by the check is reviewed; the fact that it was drawn by her own attorney and was freely and voluntarily entered into recalled; and that the contract was in settlement of the controversy between the parties thereto and superseded all prior contracts and agreements considered. All of the things to be done under the contract were carried out except the payment of the sum of $5225.45 by Miss Higgins represented by this check. The $10,800 deed of trust which she had theretofore deposited with Knickmeyer-Fleer under an agreement whereby it was to be held as security for lienable claims against the Kossuth Avenue property upon which Knickmeyer-Fleer had financed her first deeds of trust paying out the sums secured thereby only upon orders signed by her, was surrendered and returned to her and the agreement under which it had been held by Knickmeyer-Fleer abrogated. It was agreed that in lieu thereof the proceeds of the $5225.45 check should be applied first to the discharge of such claims. She received, and obtained the money on, Duke's check issued to her in conformity with the contract. The foreclosure proceedings were terminated. Duke assumed the various unpaid claims and demands, as specified in the contract, and gave the surety bond, provided for, securing payment of same. The claim that there was no consideration for the check is without merit. Nor was the payment of the check conditional. It is true Miss Higgins asked Fleer not to present the check before a certain hour the following day and he complied with her request. She agreed to pay Duke $5225.45, the contract specifying, however, that such sum be deposited with Knickmeyer-Fleer to be paid out and applied by them first to the discharge of certain lienable claims for labor and material. She made the payment by this check. It was never specified, conditioned or agreed that such sum, or the check therefor, was not to be paid until or unless Diesing bought the $10,800 deed of trust, or until or unless she sold the deed of trust. Her agreement with Diesing was her own private, personal, arrangement; defendants were in no way connected therewith. When Diesing refused to purchase her deed of trust she went to the holders of the

check and asked for further time to meet it and at that time promised to take care of the check. Though Knickmeyer-Fleer sat patiently by for more than ten days with various claimants against the fund intended to be provided by the check insistently clamoring for payment thereout, though she and her attorney had given assurance the check would be paid, though all the benefits accruing or moving to her out of the contract had been received and appropriated by her and though she received a better offer for her deed of trust than Diesing had made and thus had more than the necessary funds at her command (if the deed of trust were in fact her only available resource which does not appear) to meet the check nevertheless she evaded, made excuses and finally ceased to counsel further with her attorney, employed another attorney, and resolved she would not even try to pay the check or provide funds to take care of same. She of course knew the check was all the while outstanding, was fully cognizant of what it was intended to secure and provide for and well knew that she did not have sufficient funds in, or credit with, the bank upon which it was drawn for the payment thereof. The check was payable on or any time after its date but she deliberately resolved not to provide the necessary funds to pay it though same were available to her. She led the defendants to accept and receive the check and Knickmeyer-Fleer to surrender the deed of trust and accept an assignment of the check in lieu thereof as security for the lienable claims for labor and materials against the property whereon they had financed the first deeds of trust for Miss Higgins in the belief that the check was good and payment thereof would be made in due course. Such facts would seem to justify and warrant a conclusion on the part of a reasonably cautious and prudent layman that the plaintiff was guilty of an offense of the nature of that with which she was ultimately charged but even so these defendants submitted the matter to the prosecuting attorney. That officer, called as a witness for plaintiff, testified that no one requested that a charge be filed against Miss Higgins. The extent of the matter was an inquiry as to what could be done. He required the formal five days' notice be given (see Sec. 4306) and made at least some independent investigation. He took the matter up with Miss Higgins by telephone. He propounded the usual questions used for obtaining necessary information concerning checks of this kind and says that the information derived from the questions propounded to those reporting the matter, his own investigation and what Miss Higgins herself said seemed sufficient to him, and then without consulting further with any of the defendants, or inquiring as to their wishes in the matter, and without requiring any of them to make an affidavit as the basis of an information, he filed the information based upon his own information and belief and upon his official oath. But one construction can be placed upon the action of the prosecuting attorney, and

that is that it was his judgment that an offense within the purview of Sections 4305-4306, Revised Statutes 1929, had been committed. This is a further circumstance tending to show probable cause. Too the failure and refusal of Miss Higgins to pay the check within five days after receiving the notice which the prosecuting attorney required and directed be given was, under the provisions of Section 4306, prima facie evidence of intent to defraud and of the offense defined by said Sections 4305 and 4306. ▮ The charge of malicious prosecution is no favorite of the law and when made the elements necessary to sustain it must be strictly and clearly proven. It is said: "Actions for malicious prosecution are regarded by law with jealousy" and "ought not to be favored but managed with great caution." [Newell on Malicious Prosecution, p. 21.] And 18 Ruling Case Law at page 11, citing numerous authorities in support thereof, says that the action for malicious prosecution "has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with."

We have examined and considered the undisputed facts and the facts as developed by the evidence adduced by plaintiff, and it is our conclusion that such facts do not afford substantial evidence that no reasonable or probable ground existed for the prosecution, but tend rather to establish probable cause therefor. Therefore the demurrers to the evidence, offered by appellants, should have been sustained and a verdict for defendants directed. The judgment as to the appellants, Knickmeyer-Fleer Realty & Investment Company, Arnold J. Fleer, and Joseph Boxerman is reversed. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at May Term, 1934, July 17, 1934; motion for rehearing filed; motion overruled at September Term, September 18, 1934.