261 S.W.2d 942 (1953)
HUGHES
v.
AETNA INS. CO.
No. 43356.
Supreme Court of Missouri, Division No. 2.
September 14, 1953.
Motion for Rehearing or to Transfer to Denied November 9, 1953.
*944 Byron A. Roche, St. Louis, for appellant, Charles E. Gray, St. Louis, of counsel.
Sievers, Reagan & Schwartz, St. Louis, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied November 9, 1953.
LEEDY, Presiding Judge.
Action by Homer Hughes to recover $15,000 actual and punitive damages for the alleged malicious prosecution of a civil suit against him by defendant, Aetna Insurance Company. At the close of plaintiff's evidence the court directed a verdict for defendant, judgment went accordingly, and plaintiff has appealed.
The offending civil suit was one to recover from Hughes: (1) The amount of Aetna's out-of-pocket loss ($689) under an automobile theft policy issued by it, which loss had been occasioned, in turn, by the loss sustained by Aetna's policyholder, Ruby Motors, by reason of the alleged theft of a '39 Pontiac, against which the policy insured; and (2) $15,000 punitive damages on account of his "allegedly fraudulent. wrongful, malicious, unlawful and willful" conduct in causing such loss to Aetna. The theory on which that suit was based is disclosed by the following allegations of Aetna's answer in the case at bar: "Further *945 answering and as an affirmative defense, defendant states that on or about April 9, 1947, Homer Hughes stole an automobile from Ruby Motors, Inc., that after said automobile was stolen by Homer Hughes, defendant herein paid Ruby Motors, Inc., under an insurance policy covering theft, the sum of Six Hundred Eighty-Nine ($689.00) Dollars by reason of the theft of said automobile by Homer Hughes; that thereafter, on or about May 17, 1949, the automobile was recovered, and thereafter, the suit was instituted by defendant herein against Homer Hughes being cause Number 29767 of the Circuit Court of the City of St. Louis, to recover from Homer Hughes the money expended by this defendant by reason of the theft of said automobile by Homer Hughes; * * *." Such was the issue and contest in that case, trial of which resulted in a judgment for Hughes upon a jury verdict. No appeal was taken, the judgment became final, and the present action followed.
"The constitutive elements of an action for malicious prosecution are: (1) The commencement or prosecution of the proceedings against the present plaintiff; (2) its legal causation by the present defendant; (3) its termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damage to plaintiff by reason thereof." Coleman v. Ziegler, (Mo.) 248 S.W.2d 610, 614, and cases cited. The presence of elements (1), (2) and (3) has already been made to appear; that of (6) is unquestioned; and (5) is treated by the parties as collateral to (4) in the sense, and upon the principle that "malice may be inferred as an issuable fact from the showing of want of probable cause", Lindsay v. Evans, Mo.App., 174 S.W.2d 390, 396, and we shall so treat it. It was for the supposed absence of element (4)the required showing of want of probable causethat the verdict in defendant's favor was directed, Aetna contending then and now that plaintiff's proof not only failed to show want of probable cause for prosecuting the civil suit against Hughes as for larceny, but that probable cause therefor was established by such proof as a matter of law. We proceed, then, to an examination of the facts to determine the propriety of the directed verdict, viewing them in the light most favorable to plaintiff, giving him the benefit of all reasonable inferences to be drawn therefrom, and bearing in mind also that "since want of probable cause involves a negative, slight proof thereof is all the law requires to make a prima facie case. Williams v. Vanmeter, 8 Mo. 339, 41 Am.Dec. 644; Brown v. Selfridge, 224 U.S. 189, 32 S.Ct. 444, 56 L.Ed. 727; Douglas v. Kenney, 40 Idaho 412, 233 P. 874." Randol v. Kline's, Inc., 322 Mo. 746, 759, 18 S.W.2d 500, 506.
Preliminary to making a statement of the facts, we take occasion to say that the transcript in this case presents the very type of situation which Supreme Court rule 1.04(d) was intended to prevent, and observance of which would save the reviewing court much time, energyand patience! Here we have the single question of whether the evidence is sufficient to make a case for the jury. Throughout the 162-page record are exhibits having some bearing on that issue, but not one of these exhibits is even referred to in the index, much less identified with the required particularity, i. e., "Exhibits shall be identified in the index by number or letter and page and shall, in addition, be described so that the court can distinguish the exhibits." Laxity in complying generally with this and other sections of rule 1, governing appellate practice and procedure, has become so widespread and commonplace as to approach the point of vexatiousness. For this reason, more stringent enforcement of all its provisions, including the prescribed penalty of dismissal for violations, is in immediate prospect, and should be anticipated.
Plaintiff had lived in the community 30 years. He owned his own business, known as "Commercial Auto Body," located at 3305 Virginia, St. Louis, where he did body and fender work, including painting. One of his customers was Ruby Motors, 5700 Natural Bridge Road, a used car concern *946 owned by Henry and Nathan Rubenstein. In the six months preceding April 9, 1947, Hughes had made repairs on 25 or 30 cars for Ruby Motors, such work having been done at his own shop to which he had caused the cars to be taken from the Rubenstein or Ruby place of business. The practice in this connection was for Hughes or his employes to pick up the cars at the Ruby lot (frequently in the evening around closing time, 8:30 to 9:30 p. m.), and either tow or drive them to the shop at 3305 Virginia. The 1939 Pontiac out of which the present controversy arises was one of such cars. It was owned by Ruby Motors, and work had been done on it at the Hughes shop in accordance with custom. The car had been delivered back to Ruby Motors upon completion of the work, but complaint was made that the work was not satisfactory. The car was again picked up and taken to the Hughes shop, further work done on it, and once more it was delivered to Ruby Motors. Again the Rubensteins complained, this time that certain paint work called for by the contract had not been done. Whereupon Hughes made an arrangement with Nathan Rubenstein whereby he (Hughes) would pick up the car early the next morning, April 9, 1947, his testimony in that connection being: "I told Nathan to have the car so that I could get it out of there and I wouldn't have to move a lot of automobiles, and he said he would, and he would leave it open for me." The plaintiff further testified that when he picked up the car the next morning "everything was there waiting for me so I could pull the car out, it was free and clear of everything." This appears to have been before Ruby Motors was open for business, but nevertheless at an hour "when everybody was going to work out there at the Small Arms plant." He towed the car to his place of business, did the painting requested, then notified Nathan Rubenstein that the car was ready, but that there would be an additional charge of $6 for the work, and that "if he wanted it this time, he would have to come down and get it." He further testified that Rubenstein "said he wouldn't come down and get it; that I should deliver it. I told him if he wanted the car he should send his man down there with the motorcycle and pick it up."
Later that day, on the complaint of the Rubensteins, the police appeared at the Hughes shop and placed him under arrest. He testified that at the time of his arrest he told Bauer, the police detective who interrogated him: "Yes, I have got the car, but Mr. Rubenstein owes me a bill on it. He said, `Well, do you want to tell me where the car is at?' I says, `Well, I am going to keep the car until I get what I have got coming on it,' and he [Bauer] said `O.K.' * * * I have the automobile but I have a lien against it for repair work."
Detective Bauer corroborated plaintiff, his testimony on that point being that when he questioned Hughes on the Rubensteins' complaint of the car having been taken without the consent of the owner that "Mr. Hughes said that he did move the unit from the lot for the purpose of repairing it, and that he did have possession of the car. However, he stated that there was some controversy over payment of the repair bill on that car, and that he was holding it until a settlement was made." Bauer further testified that upon inquiry as to the whereabouts of the car, "Mr. Hughes said at the time he didn't care to tell where it was at. However, he did have it, and when the deal was satisfied about the payment on the car, he would gladly bring it in. That was his statement." Hughes' statement (that he admitted having the car and his purpose in withholding it) was incorporated into the police report of the investigation, a microfilm copy of which report, numbered 49365, was produced at the trial by the police department under a subpoena duces tecum. On the basis of that report it was shown that the warrant officer of the district refused to issue a warrant. Two months later, in June, 1947, the circuit attorney's office did cause a warrant to be issued for Hughes on a charge of theft of the automobile. At his preliminary hearing on that charge, held in December, 1947, he was discharged. It is not contended that the present defendant had any connection with, or responsibility for, the arrest of Hughes, *947 nor the ensuing criminal proceedings against him, as such.
Plaintiff caused the car to be stored in a private garage at 4609 Westminster, rear, where it remained approximately two years, and until Aetna paid him the sum of $89, the amount of the claimed charges. In explanation of his reason for keeping the car at that location, his testimony was that he "couldn't very well leave it around the place because there was always spray dirt and everything like that around there, and there was always a possibility that somebody might strip it in sitting out on the lot, so I stored it where it would be in good shape." He further testified that while he did not disclose the exact whereabouts of the storage place, he nevertheless told both Nathan and Henry Rubenstein that he had the car in storage.
About two weeks after he was first arrested, plaintiff received a letter from Jesse Bishop, the attorney for Ruby Motors, enclosing a "mutual release" and stating that if he (Hughes) signed the release he would pay him for the automobile, and that they would also come down and get the car. At that time plaintiff told the attorney that he would not take his check; that he wanted the cash; and that he could come down and get the car, but this was never done.
On cross-examination plaintiff denied that he ever knew the police "were looking for the car as a stolen automobile" during the period of his possession, but, on the contrary, insisted that "they [the police] knew where they could get it at all times," and that the Rubensteins and their attorney knew at all times they could get the car by paying the bill on it.
Early in 1949, the garage in which the car was stored being then about to be razed, Hughes, through his attorney, Ebeling, contacted Bishop, the attorney for the Rubensteins, who referred the matter to Finnegan, an independent adjuster (operating as "Universal Adjustment Service Co.") employed by Aetna, and who adjusted the original loss. Finnegan (acting for Aetna) and Ebeling, as attorney for Hughes, concluded negotiations under which Aetna paid the $89 in question, and took delivery of the car. Finnegan's letter to Hughes' attorney, evidencing their arrangement, marked "Exhibit 1," reads as follows:
 "April 27, 1949
 "Mr. Michael J. Ebeling, Attorney
 "6330 Clayton Road
 "St. Louis 17, Missouri
 "Re: Ruby Motors CompanyAssured
 "Theft4/9/47Our No. 23272
 "Policy No. 2421485 AEtna Ins. Co.
"Dear Sir:
"Your letter of January 28, 1949, addressed to Jesse Bishop, Attorney, has been referred to the writer for attention.
"Since that time I have discussed this matter with you and, in line with your letter, I am enclosing herewith AEtna Insurance Company draft dated April 22, 1949 payable to Homer Hughes, your client, in the sum of $89.00, in connection with 1939 Four-door Pontiac Sedan Six cylinder, Motor No. 8-166233, Serial No. 8EA-5922, the property of Henry and Nathan Rubenstein doing business as Ruby Motors, Inc. which car was reported stolen from their lot on April 9, 1947.
"In line with the demands of your letter of January 28, 1949, will you please have your client, Homer Hughes, re-deliver the above car to me at once or advise the writer where above car is now located where same can be recovered undamaged and intact and free and clear of any and all charges against it.
"Please acknowledge receipt of draft and awaiting your advices.
 "Very truly yours,
 "Universal Adjustment Service Co.
 R. E. Finnegan"
 "REF :ms.
 "Enclosure.
Finnegan, the adjuster, was called as a witness on behalf of plaintiff. Concerning *948 the nature and extent of the investigation he made as Aetna's agent and employe, whereon the Ruby Motors theft claim was paid, he testified that after ascertaining that the insureds' records showed that they owned the car, he then verified Nathan Rubenstein's oral statement that he had reported the theft to the police. The transcript then shows the following:
"Q. Did you check to see if the police report had been made? A. Yes, I did.
"Q. Did you make a copy of that police report? A. I assume I did. I don't recall. I might have just glanced at it, I don't remember that, but I did see the report.
"Q. Can you remember when you looked at the police report if you noted the contents of the report? A. I did.
"Q. Did you at that time know that Homer Hughes admitted having possession of the automobile? A. Yes, I understood that he had possession of the automobile, that is from the police report, not from him.
"Q. But you never did contact him? A. I did not.
"Q. Will you tell me the reason for that? A. I certainly can. Our policy covers theft of an automobile, whether by a friend or someone a stranger, and if Mr. Hughes had taken that automobile without the permission of Ruby Motors, it was just as much a theft as if some stranger came and took it off the lot.

* * * * * *
"Q. Did he [Nathan] state who took the automobile? A. He may have voiced his suspicion. As I recall, he did.
"Q. Who did he suspect? A. As I recall, it was Homer Hughes.
"Q. With the knowledge that he suspected Homer Hughes and that Homer Hughes' name appeared upon the police report and that Homer Hughes admitted having possession of this automobile * * * under those circumstances didn't you feel it necessary to take a statement or at least contact the accused? A. No. I definitely, intentionally, kept away from Homer Hughes because that was a criminal matter. The police department had that in hand.
"Q. On whose advice, if any, did you stay away from Homer Hughes? A. Nobody, my own.
"Q. On your own? A. Yes, sir.
"Q. You have handled many claims concerning theft of automobiles, haven't you? A. Quite a few.
"Q. Is it the usual practice for an insurance company to pay a theft claim when it is known who has the automobile? A. Yes, it is. * * *
"Q. In other words, what evidence do you have, or what do you take? Do you take the owner's word? A. I take the owner's word, yes, sir.
"Q. And you do no further investigating? A. Other than to inspect, or if we can locate the automobile, that is our prime business."
The witness further testified that the matter of the supposed theft was first referred to him about 30 days after it occurred, that is, about May 9, 1947, at which time he went by the premises at 3305 Virginia after Rubenstein "indicated his suspicions," but did not go in; he did not see the car there, nor did he talk to either of the two persons in the shop. Not finding the car there, he then "bulletined it through the National Auto Protection Insurance, an organization formed by insurance companies," describing it by motor number, equipment, color, etc., and "that is sent to all 48 states." In thus bulletining it, he did not disclose "that Homer Hughes claimed he had possession of the car." Within 60 or 90 days thereafter the Aetna paid the Rubensteins the sum of $600 in settlement under the policy and took from them an assignment of the title to the car, *949 the Rubensteins having in the meantime presented sworn proof of loss stating "car stolen from lot of insured's premises" on April 9, 1947, and which proof of loss was offered in evidence by Aetna as a part of the cross-examination of Finnegan.
After payment of the loss, no action was taken to recover the automobile from Hughes until Mike Ebeling contacted the witness "and indicated that he represented Homer Hughes and indicated that if we would pay him $89 he would turn the car over to us.
"Q. Did he indicate why he wanted $89? A. Yes, he did. He said it was on account of some repair work that was in dispute between Homer Hughes and Ruby Motors."
On redirect examination the witness was asked if he advised counsel for Aetna and Mr. Brown, its manager, "that the police report showed that Homer Hughes stated that he had possession of the automobile," to which witness replied, "Yes, whatever was in the police report, I advised them.
"Q. You advised them of the full contents of the police report? A. That is right."
Further, that when the claim was paid, Aetna's attorneys and its manager "had full knowledge that he [Hughes] claimed he had the car under a mechanic's [garage keeper or repairman's] lienfor money due." It was developed on cross-examination of Finnegan that Aetna's civil action against Hughes was prepared and actually filed by him in his capacity as their attorney (as distinguished from adjuster), although it appears that this was done on advice of the company's regular attorneys, and he did not participate in the trial other than as a witness. His further testimony was to the effect that before the civil action was brought by Aetna, he investigated and knew that "Mr. Hughes had been prosecuted for this alleged theft," and had been discharged on his preliminary hearing, and he had given this information to the company.
Inferences to be drawn from certain other portions of the cross-examination of this witness were not entirely favorable to plaintiff, but these need not be stated inasmuch as they are at variance with those that are favorable and the latter control in determining the issue of submissibility.
"With the necessary changes in points of detail, the same principles determine questions of probable cause in civil proceedings as in criminal." Wilcox v. Gilmore, 320 Mo. 980, 986, 8 S.W.2d 961, 962. At the same local citation it is said: "Probable cause `consists of a belief in the charge or facts alleged, based on sufficient circumstances to reasonably induce such belief in a person of ordinary prudence in the same situation.'" And in Higgins v. Knickmeyer-Fleer Realty & Investment Co., 335 Mo. 1010, 1026, 74 S.W.2d 805, 813, it was said that "Probable cause is reasonable cause and may be defined as the existence of such a state of facts as would warrant an ordinarily cautious and prudent man in the belief that the accused is guilty of the offense charged." But, as pointed out in Lindsay v. Evans, Mo.App., 174 S.W.2d 390, 396, "probable cause does not depend upon what may have ultimately proved to be the actual state of facts embraced in the previous action or proceeding, but instead upon the honest and reasonable belief of the one who instigated its prosecution. If it appears that a reasonably prudent person would have believed and acted under the circumstances as such person did, then the existence of probable cause is sufficiently established; but on the other hand, if it appears that the facts and circumstances would not have warranted an ordinarily prudent person in entertaining an honest belief that both his action and the means taken in the prosecution of it were legally just and proper, then there is an absence of probable cause, and an action for malicious prosecution will lie, if the other essential elements be present." The defendant in a malicious prosecution action "is to be held responsible, not only for the facts he knew when he caused the suit to be instituted but also for all other facts pertinent to the suit which he could have *950 ascertained by due diligence prior to causing the law to be put in motion." McAnarney v. Commonwealth Loan Co., Mo. App., 208 S.W.2d 480, 486, citing La Chance v. National Pigments & Chemical Co., Mo.App., 104 S.W.2d 693; Jones v. Phillips Petroleum Co., Mo.App., 186 S.W. 2d 868. This is but another way of saying defendants in such cases are responsible for facts they could have known by reasonable inquiry. Randol v. Kline's, Inc., 322 Mo. 746, 18 S.W.2d 500.
In the prior action, the court overruled Hughes' motions for a directed verdict (offered at the close of Aetna's case, and at the close of all of the evidence), and Aetna relies on this fact as conclusively establishing the existence of probable cause. Probable cause, as affected by such a ruling, is not considered or discussed in any of the cases cited in support of the proposition. Wilcox v. Gilmore, supra; Beatty v. Puritan Cosmetic Co., 236 Mo. App. 807, 158 S.W.2d 191; Wilkerson v. McGhee, 265 Mo. 574, 178 S.W. 471; Dawes v. Starrett, 336 Mo. 897, 82 S.W.2d 43; Higgins v. Knickmeyer-Fleer Realty & Investment Co., supra; Laughlin v. St. Louis Union Trust Co., 330 Mo. 523, 50 S.W.2d 92; Short v. Spragins, 104 Ga. 628, 30 S.E. 810. As will be seen, all of the Missouri cases just mentioned involved either a judgment in favor of the plaintiff in the original proceeding (if a civil case), or the return of an indictment against the accused, if a criminal prosecution. They hold that such a judgment or indictment constitutes prima facie evidence of probable cause, and becomes conclusive thereof in the absence of a showing that it was procured by fraud, perjury, or other unfair means, or that the parties responsible for the prosecution did not believe the testimony which induced the judgment or indictment, or did not believe the accused to be guilty, and this is true even though the judgment be later reversed on appeal or set aside for irregularity.
The Georgia case relied on is so readily distinguishable on its facts as to require little discussion. It did apply the principle to the granting of a temporary injunction and the appointment of a receiver, but even so the analogy is not close enough to be persuasive under the facts at bar. We are unwilling to extend the rule so as to make it applicable in the equivocal circumstance that a trial judge permits a case to go to the jury.
It is next contended that the evidence affirmatively shows probable cause for the reason that Hughes' own testimony "in the present case shows him to be guilty of a felony in the taking of the automobile." Aetna's theory in this contention and the facts on which it is based are thus developed and expressed in the argument in the brief (these being the only facts referred to): "In the present case Hughes testified that he went to the automobile place of Ruby Motors on the early morning of April 9, 1947, before anyone had arrived at that place of business and took the Pontiac car in question to his repair shop at 3305 Virginia; that thereafter he moved the car without any consent or approval of its owner and hid it in a garage on Westminster Avenue for two years. This court held in State v. Liston, 318 Mo. 1222, 2 S.W.2d 780, that such facts constituted embezzlement of an automobile. * * * Since Hughes has admitted such acts in this case of the secreting and hiding of the automobile in a private garage for more than two years, Aetna was justified * * in concluding that Hughes had stolen the car for which Aetna had been required to pay a theft loss under its policy." We do not so construe the Liston case, nor do we find any similarity between the facts of the two cases. Liston claimed no lien on the car he embezzled. It had been furnished to him by the owner to make an emergency trip of 20 miles in one direction, and instead, he went off in another, wrecked the car, abandoned it, took flight, and remained away until apprehended in Kansas City and returned to Boone County two months later.
Aetna's present contention wholly ignores the existence of Hughes' lien on the car (a fact, which for present purposes, must *951 be treated as admitted) and the law applicable to such liens, and misinterprets Hughes' testimony. "It is a well-recognized rule that the lien which a mechanic ordinarily has at common law on personal property for the value of repairs made thereto extends to labor and materials expended and used in repairing automobiles." 24 Am.Jur., Garages, Parking Stations, and Liveries, § 54. Such a lien is merely the right to retain possession of the property to which the lien attaches until the debt is paid, and the lienholder has no remedy at law for its active enforcement in the absence of a statute, 53 C.J.S., Liens, § 19, page 869, and there is no such statute in this state. "As a general rule a lien dependent on possession is waived or lost by the lienholder voluntarily and unconditionally parting with possession or control of the property to which it attaches." 53 C.J.S., Liens, § 17(3), page 864.
Our conclusion is that, taking plaintiff's evidence as true, viewing it in the light most favorable to him, and giving him the benefit of all favorable inferences, as we are required to do, it not only repels any idea, showing or proof of larceny, but, when so viewed, it fails to establish a single element of that offense.
It is next contended that "advice of counsel is a complete bar to this suit since Aetna instituted the previous civil action on advice of counsel." This contention is based on certain conclusions elicited from the witness Finnegan on his cross-examination by defendant's counsel, as follows (objections and rulings omitted):
"Q. Now after that, Mr. Finnegan, the car had been recovered, did you discuss the case from beginning to end then with Mr. Smith of the Aetna and myself as attorney for the company? A. I did.
"Q. At that time were all the facts that you knew or had any knowledge of or information of presented to me as attorney for the company to determine whether or not the company should institute a suit against Homer Hughes to recover for the loss? A. All the facts were submitted to you.
"Q. You know then at that time after going over all the facts that I advised the company that I thought they should file a suit and seek to recover their damages? A. I do.
"Q. And subsequent to that on my advice you did file suit against him? A. I did.
"Q. And you testified in that case? A. I did.
"Q. At the time you submitted those facts and reviewed the file in detail prior to the filing of the civil suit against Mr. Hughes, did you honestly and fairly state and reveal to the attorney all of the facts and information that you had up to that time? A. I did.
"Q. And after the matter was turned over to Aetna's attorney the matter was handled from then on out by the attorney, wasn't it? A. That is correct.
"Q. You had nothing more to do with it other than to testify as a witness? A. I had nothing more to do with it."
The first reason why it would have been improper to direct a verdict for defendant on the strength of this showing is that the defense of advice of counsel is affirmative in nature, and one on which the defendant had the burden of proof. 54 C.J.S., Malicious Prosecution, § 84(7), page 1058; Higgins v. Knickmeyer-Fleer Realty & Investment Co., 335 Mo. 1010, 1025, 74 S.W.2d 805, 812. See, also, Anno., 10 A.L.R.2d 1272, § 20. Had the same facts been developed by defendant as a part of its own case, and plaintiff had put on no countervailing evidence, no one would contend that defendant would have been entitled to a directed verdict thereon. And so, conversely, the circumstance that testimony tending to support an affirmative defense comes from the lips of a witness *952 called by the plaintiff is not to be treated in any sense as a judicial admission by such plaintiff of the truth of the facts thus shown, but the credibility of that witness still remains for the jury. "The jury, in the first instance, is the sole judge of the credibility of the witnesses and of the weight and value of their evidence, and may believe or disbelieve the testimony of any one or all of the witnesses, though such evidence be uncontradicted and unimpeached." Cluck v. Abe, 328 Mo. 81, 84, 40 S.W.2d 558, 559.
Besides this, under the testimony relied on, it was not left with the jury to say whether the disclosure was full and true. That inference was attempted to be drawn by the witness by testifying to his conclusion that he did make a full statement, but without disclosing the details of the communication on which that conclusion was based, and this is insufficient. 34 Am.Jur., Malicious Prosecution, § 146.
We are constrained to hold that probable cause did not appear from plaintiff's proof, as defendant contends, and we think it has been demonstrated by what has been said that there was a sufficient showing of want of probable cause to warrant submission of the case to the jury. The judgment is, accordingly, reversed, and the cause remanded.
All concur.